Chief Judge Conway.
Plaintiff wife, who was suffering from bursitis in the right shoulder, received a series of X-ray treatments from defendants, doctors specializing in X-ray therapy. After the third treatment she experienced a nauseous feeling. She told one of the defendants about it before he administered the fourth treatment. He prescribed certain pills which she purchased and took. At the conclusion of the sixth treatment she still had a pain in her right shoulder and one of the defendants suggested that if the pain continued she should come back for a seventh treatment. The pain persisted and three days later she returned and the seventh treatment was administered. Subsequent thereto, the shoulder began to itch, turned pink, then red, and blisters formed. These blisters ruptured and the skin peeled, leaving the raw flesh of the shoulder exposed. Scabs formed and lasted several months, a few as long as five or six months and one lasted several years, leaving the shoulder with a permanently marginated area of skin approximately three by five inches exhibiting telangiectasia, hyperigmentation, depigmentation and a suggestion of atrophy. This condition was diagnosed as chronic radiodermatitis which was caused by the X-ray therapy. While the blisters were still present the plaintiff went back to the defendants and showed them the condition of her shoulder. They gave her a prescription for some salve which she procured and used.
On December 3, 1951, approximately two years after the treatments, the plaintiff was referred by her attorney to a dermatologist for examination. After taking a history and making an examination the dermatologist prescribed a substance used in the treatment of radiodermatitis and advised the plaintiff to *19 have her shoulder checked every six months inasmuch as the area of the burn might become cancerous.
The instant action for malpractice was predicated upon three theories: (1) that the total number of Roentgens (1,400) applied to the plaintiff was excessive; (2) that the total number of Roentgens was excessive when applied to a single field or portal of the shoulder area; and (3) that in any event the amount applied was excessive insofar as this particular patient was concerned and the defendants could and should have been aware of this when the plaintiff complained of nausea before the fourth treatment, in that it is unusual for nausea to result from X-ray treatment to the shoulder and was under the circumstances a possible indication that the patient was sensitive to radiation and the dosage thereafter should have been discontinued or reduced. In addition to adducing evidence with respect to the treament and the injuries, the plaintiff offered the testimony of a duly qualified radiologist who supported the three theories of malpractice. To disprove the plaintiffs’ case the defendants, in addition to so testifying themselves, produced four duly qualified radiologists who testified that the dosage was not excessive under any view of the facts. Plaintiff also introduced, on the issue of mental anguish, the testimony of a neuro-psychiatrist to the effect that she was suffering from a severe cancerophobia, that is, the phobic apprehension that she would ultimately develop cancer in the site of the radiation burn. The witness further testified that she might have permanent symptoms of anxiety.
The jury rendered a verdict in favor of plaintiff Eleanor Ferrara in the sum of $25,000 and in the sum of $1,000 to her husband, plaintiff Bernard Ferrara, for the loss of her services. The Appellate Division unanimously affirmed. We granted leave to appeal for the sole purpose of passing on the propriety of the award of $15,000 of the $25,000 to the plaintiff for mental anguish flowing from the cancerophobia.
The plaintiff’s statement that the dermatologist told her she should have the shoulder checked every six months because there was a possibility that cancer might develop was not adduced to establish the fact that the site of the burn might become cancerous. As her attorney said at the trial, “ we are not making any claim that this person is going to sustain a *20 cancer. We are going on a neurosis.” Since the statement of the dermatologist was introduced not for the purpose of proving that plaintiff would develop cancer but merely for the purpose of establishing that there was a basis for her mental anxiety, such testimony was not objectionable hearsay (see People v. Jung Hing, 212 N. Y. 393, 406; People v. Hines, 284 N. Y. 93, 110; 6 Wigmore on Evidence [3d ed.], § 1766). Nor do we believe that it was improper for the trial court to permit the jury to consider such testimony in determining the amount of the recovery against the defendants.
In this State, as in most other States, the “ rule is now well established that a wrongdoer is liable for the ultimate result, though the mistake or even negligence of the physician who treated the injury may have increased the damage which would otherwise have followed from the original wrong.” (Milks v. McIver, 264 N. Y. 267, 270; see, also, People v. Kane, 213 N. Y. 260.) It is only where the causal connection between the original injury and the ultimate damage may be said to be ” too tenuous ” that the original wrongdoer will be freed from liability for the ultimate damage (see Milks v. McIver, 264 N. Y. 264, 270, supra). In our judgment, this is not such a case. On the contrary, there was a real connection between the ultimate damage and the original wrong. The employment of the dermatologist must be regarded as a natural consequence of the original wrongdoers’ tort because the necessity for such employment was imposed upon the plaintiff by the original wrongdoers’ fault and because the plaintiff, an unprofessional person, did all that she could do, or at least, in the conditions obtaining, what she had a right to do, when she employed the dermatologist to treat and heal her injury. The original wrong certainly occasioned the examination and treatment by the dermatologist. He prescribed a substance to be used by plaintiff for the burn. Had such substance aggravated plaintiff’s injury no one could doubt that, under the present state of our law, the original wrongdoers would be responsible for the resulting damage to its full extent including additional mental anguish caused plaintiff. The only difference here is that the later treatment by the dermatologist did not aggravate the physical injury inflicted by the original wrongdoers but, rather, increased only the mental anguish attendant upon such injury. vWe perceive *21 no sound reason for drawing a distinction between the two situations. The dermatologist apparently thought it essential as part of his treatment and as a protective measure for plaintiff to advise her to have her shoulder checked every six months because of the possibility of cancer. Under our law the risk of such advice and its effects on the plaintiff must be borne by the wrongdoers who started the chain of circumstances without which the cancerophobia would not have developed.
This case is somewhat novel, of course, in that it appears to be the first case in which a recovery has been allowed against the original wrongdoer for purely mental suffering arising from information the plaintiff received from a doctor to whom she went for treatment of the original injury. We have concluded, however, that under the circumstances of the case such recovery was justified.
Freedom from mental disturbance is now a protected interest in this State. “ [T]he only valid objection against recovery for mental injury is the danger of vexatious suits and fictitious claims, which has loomed very large in the opinions as an obstacle. The danger is a real one, and must be met. Mental disturbance is easily simulated, and courts which are plagued with fraudulent personal injury claims may well be unwilling to open the door to an even more dubious field. But the difficulty is not insuperable. Not only fright and shock, but other kinds of mental injury are marked by definite physical symptoms, which are capable of clear medical proof. It is entirely possible to allow recovery only upon satisfactory evidence and deny it when there is nothing to corroborate the claim, or to look for some guarantee of genuineness in the circumstances of the case. The problem is one of adequate proof, and it is not necessary to deny a remedy in all cases because some claims may be false. The very clear tendency of the recent cases is to refuse to admit incompetence to deal with such a problem, and to find some basis for redress in a proper case.” (Prosser on Torts, § 34, pp. 212-213.) The present case is a proper one for redress since we find a “ guarantee of genuineness [of the cancerophobia] in the circumstances of the case.” Plaintiff suffered an X-ray burn which did not heal for an unusually long period of time. One scab on plaintiff’s shoulder lasted several years and her shoulder was left with a permanently marginated area of skin approxi *22 mately three by five inches exhibiting telangiectasia, hyperigmentation, depigmentation and a suggestion of atrophy. It is common knowledge among laymen and even more widely among lay women that wounds which do not heal over long periods of time frequently become cancerous. Physical culture lectures to high school and college students, radio advice from life insurance companies, newspaper daily articles by doctors — all give the same advice. Here, in addition, plaintiff was personally advised by a doctor specializing in dermatology that her wound might develop into cancer and that she should, therefore, have it checked every six months. That would appear to have been sound advice. It is entirely plausible, under such circumstances, that plaintiff would undergo exceptional mental suffering over the possibility of developing cancer. The jury, Avho, under our Constitution (art. I, § 2), must determine questions of fact, including credibility, observed the plaintiff’s demeanor on the stand and accepted her testimony as true. Inasmuch as the circumstances of the case corroborate the plaintiff’s claim, there is no warrant in law for overturning the jury’s verdict.
It is self-evident that every case must be decided according to the facts peculiar to it. The verdict in the present case is supported by the facts. We do not see that we need announce a principle concerning the extent to which an original wrongdoer may be held for mental anguish caused to his victim as a result of information received from another doctor during the treatment of the original injury. The applicable principle has already been stated in Milks v. McIver (264 N. Y. 267, 269, supra): “ Liability for damages caused by wrong ceases at a point dictated by public policy or common sense.” In the present case neither public policy nor common sense is offended by this jury verdict. Each negligence case must, in turn, be solved “pragmatically.” (Bird v. St. Paul Fire & Mar. Ins. Co., 224 N. Y. 47, 52, 53).
The judgment of the Appellate Division should be affirmed, with costs.