■ VANESSA SIMS et al., Respondents, v COMPREHENSIVE COMMUNITY DEVELOPMENT CORP. et al., Appellants, et al., Defendant. [835 NYS2d 163]—

Judgment, Supreme Court, Bronx County (Alexander W. Hunter, Jr., J.), entered on or about November 2, 2005, which, upon a jury verdict, awarded plaintiffs collectively damages against defendants-appellants in the aggregate principal amount of $592,500, plus interest, costs and disbursements, modified, on the law, to vacate the portion of the award ($75,000) that is based on past post-traumatic stress disorder allegedly suffered by plaintiff Vanessa Sims more than six months after the incident giving rise to the claim, and, on the facts, to vacate the portion of the award ($487,500) that is based on plaintiff Vanessa Sims's past fear of AIDS within the first six months af-

ter the incident giving rise to the claim, and to remand the matter for a new trial solely as to such damages, and otherwise affirmed, without costs, unless plaintiff Vanessa Sims stipulates to an award in the principal amount of $250,000 for the first six months of her past fear of AIDS, and to entry of an amended judgment in accordance therewith.

Plaintiff Vanessa Sims, a medical assistant, while working as an extern at a clinic operated by defendants-appellants (collectively, Burnside), pricked her finger in the course of discarding a needle she had used in attempting to draw blood from an HIV-positive patient. In this action, Sims—whose subsequent tests for HIV infection have all yielded negative results—asserted claims against Burnside and the school that trained her (Ultrasound) for the psychological injuries she allegedly has suffered due to her fear of contracting AIDS as a result of the needle-stick incident. The jury awarded Sims $650,000 for her fear of contracting AIDS during the first six months after the needle-stick incident and, in addition, $100,000 for post-traumatic stress disorder stemming from the incident that she allegedly suffered after the end of that six-month period.[1] The jury apportioned responsibility for the incident 25% to Ultrasound (which thereafter settled with plaintiffs prior to entry of judgment) and 75% to appellant Burnside. Although the jury found that Sims had been negligent, it further determined that her negligence was not a proximate cause of her injury. The judgment against Burnside awards plaintiffs damages in the aggregate principal amount of $592,500, which constitutes 75% of the jury's total award of $790,000, apparently reflecting a deduction for Ultrasound's 25% share of the liability.

With regard to the award for post-traumatic stress disorder that Sims allegedly suffered more than six months after the needle stick, this case is controlled by this Court's prior decision in *Ornstein v New York City Health & Hosps. Corp.* (27 AD3d 180 [2006], *appeal dismissed* 6 NY3d 891 [2006]). In *Ornstein*, this Court, following the Second Department precedent of *Brown v New York City Health & Hosps. Corp.* (225 AD2d 36 [1996]), specifically held, for reasons fully explained in the majority opinion, that such damages are not recoverable in a case where the plaintiff has never tested positive for HIV infection. Accord-

---

1. No appellate issue has been raised concerning the jury's $40,000 derivative award to Sims's husband.

ingly, we modify the judgment to vacate the $75,000 portion of the award that is based on such nonrecoverable damages.[2]

We further modify the judgment to vacate the portion of the award ($487,500) that is based on damages for Sims's fear of contracting AIDS during the six months immediately following the needle-stick incident, and remand the matter for a new trial solely as to such damages unless Sims stipulates to entry of an amended judgment incorporating a reduced award of $250,000 for such damages, as indicated. We take this action based on our finding that, on this record, the jury's award for AIDS phobia during the six-month period at issue deviates materially from what would be reasonable compensation (*see* CPLR 5501 [c]).

We have considered Burnside's remaining arguments and find them unavailing. We note that Burnside's argument that the verdict was inconsistent insofar as it found that plaintiff had been negligent, but that her negligence was not a substantial factor in causing her accident, is unpreserved for appellate review because it was not raised until after the jury was discharged (*see Grzesiak v General Elec. Co.*, 68 NY2d 937, 938-939 [1986]; *Barry v Manglass*, 55 NY2d 803, 806 [1981]). Further, Burnside may not avoid the consequence of its failure to preserve the inconsistency argument by characterizing it as an argument addressed to the weight of the evidence. Concur— Tom, J.P., Andrias and Friedman, JJ.

Catterson and Kavanagh, JJ., dissent in a memorandum by Catterson, J., as follows: The majority holding rests entirely on the legal reasoning of the Second Department decision in *Brown v New York City Health & Hosps. Corp.* (225 AD2d 36 [1996]) as reiterated and adopted by this Court in *Ornstein v New York City Health & Hosps. Corp.* (27 AD3d 180 [1st Dept 2006], *appeal dismissed* 6 NY3d 891 [2006]). Because I continue to believe that *Brown* represents a departure from common-law principles

---

**2.** We note that the dissent, in claiming that the reasoning of *Brown* and the *Ornstein* majority is flawed by "illogic" that is "startling," itself commits a logical error. Repeating verbatim assertions he made in his dissent in *Ornstein* (*see* 27 AD3d at 191), our dissenting colleague asserts that HIV tests "are inaccurate for 5 out of every 100 individuals tested," and that "5% of those testing negative will actually become HIV positive." This is emphatically *not* what the statistics referenced in *Brown* and the *Ornstein* majority opinion show. Rather, those statistics show that "95% of . . . *HIV carriers* will test positive within the first six months of having been infected" (*Ornstein*, 27 AD3d at 186 [emphasis added]). Since the tests obviously are also given to people who are not infected (the overwhelming majority of whom presumably receive negative test results), we are not aware of any basis for the dissent's claim that the tests yield inaccurate results in 5% of *all* cases in which they are used.

of tort liability that is more properly left to the State Legislature, I must respectfully dissent anew.

The law in New York on the topic of emotional or psychological injury has been subject to various insults through the years, most of which have been visited upon it not through the evolution of the common law but rather from the courts' use of imprecise language and various colloquialisms. Clarification rather than repetition or obfuscation is necessary to avoid depriving plaintiffs of rights recognized for decades. Most recently, we held that, "all there need be to recover for emotional injury . . . is breach of a duty owing from defendant to plaintiff that results directly in emotional harm, and 'evidence sufficient to guarantee the genuineness of the claim,' i.e., an 'index of reliability,' such as, for example, contemporaneous or consequential physical injury." (*Garcia v Lawrence Hosp.*, 5 AD3d 227, 228 [1st Dept 2004] [citations omitted].) This holding is implicitly limited to those cases where a breach of some duty to the plaintiff results directly in emotional harm suffered by the plaintiff with either no physical injury or slight injury.

It is important to again call to the majority's attention that there are three different broad categories of emotional injury cases. Failure to clearly differentiate which of the three categories the plaintiff's cause of action resides in is the source of some confusion by *both* the bench and the bar, confusion which has not been alleviated by our adoption of *Brown* (*supra*) or *Ornstein* (*supra*).

In *Ferrara v Galluchio* (5 NY2d 16, 21 [1958]) the Court first announced in unequivocal terms that emotional injuries are compensable: "Freedom from mental disturbance is now a protected interest in this State. '[T]he only valid objection against recovery for mental injury is the danger of vexatious suits and fictitious claims, which has loomed very large in the opinions as an obstacle. The danger is a real one, and must be met. Mental disturbance is easily simulated, and courts which are plagued with fraudulent personal injury claims may well be unwilling to open the door to an even more dubious field. But the difficulty is not insuperable. Not only fright and shock, but other kinds of mental injury are marked by definite physical symptoms, which are capable of clear medical proof. It is entirely possible to allow recovery only upon satisfactory evidence and deny it when there is nothing to corroborate the claim, or to look for some guarantee of genuineness in the circumstances of the case. The problem is one of adequate proof, and it is not necessary to deny a remedy in all cases because some claims may be false. The very clear tendency of the recent cases is to

refuse to admit incompetence to deal with such a problem, and to find some basis for redress in a proper case.' (Prosser on Torts, § 34, pp. 212-213.)"

In *Ferrara,* the Court allowed a claim for "exceptional mental suffering over the possibility of developing cancer." (5 NY2d at 22.) The rationale of this line of breach of duty cases has been extended to claims of emotional injury where there was no physical injury to the plaintiff whatsoever. (*See Battalla v State of New York,* 10 NY2d 237 [1961]; *Johnson v State of New York,* 37 NY2d 378 [1975]; *Lando v State of New York,* 39 NY2d 803 [1976].)

The breach of duty line of cases must be distinguished from the second category where the claimed emotional injury results solely from harm inflicted on another and where no duty is owed by the defendant to the party claiming emotional injury. In *Tobin v Grossman* (24 NY2d 609 [1969]), the Court refused to permit a claim for a mother's emotional injury suffered upon learning that her child was injured in an automobile accident that the mother did not witness. The Court declined to extend recovery in tort to third persons where both the physical injury or impact and fear of such injury were visited solely upon another.

The third category of cases involves a breach of a duty owed to the plaintiff which results in emotional injury arising out of physical injury to a third person. In *Howard v Lecher* (42 NY2d 109 [1977]), the Court refused to allow a claim for emotional injury brought by parents of a child who died of a disease due to the obstetrician's failure to test for and diagnose the probability of the child contracting that disease. Although the Court recognized that the doctor owed some duty to the parents, the Court nonetheless held that there could be no recovery for the parents' emotional distress because the injury was consequential and not direct. (42 NY2d at 112.)

In *Howard,* the Court reiterated the precedent on recovery for emotional distress and held that when a party's negligence is directly responsible for a physical injury, the plaintiff may recover for the attendant emotional injury as well as the physical injury; the plaintiff may also recover when there is no physical impact but the party is subjected to fear of physical injury because of the defendant's tortious conduct. Further, the Court reiterated that recovery may be had for emotional harm *even in the absence of physical harm or fear of physical injury* so long as the emotional harm is *"genuine, substantial, and proximately caused by the defendant's conduct."* (42 NY2d at 111-112 [emphasis added].)

Clearly, the standard or proof by which emotional distress will be determined as "genuine" or "substantial" lies at a different point on the spectrum from the bright-line "objective" and "reasonable" standard used by the *Brown* court and favored by the majority in *Ornstein* and by the majority today. In *Ferrara*, the Court held that a "guarantee of genuineness" was to be found in the "circumstances of the case." (*Ferrara v Galluchio, supra* at 21.) In *Johnson*, the Court found "especial likelihood of genuine and serious mental distress, arising from the special circumstances, which serves as a guarantee that the claim is not spurious." (*Johnson v State of New York*, 37 NY2d at 382.)

Genuineness, then, is clearly and appropriately a question of fact, not a matter of law. (Robert J. Rhee, *A Principled Solution for Negligent Infliction of Emotional Distress Claims*, 36 Ariz St LJ 805, 832 [2004] [compensable mental injury should be proved by appropriate evidentiary methods including expert testimony, physical symptoms, hospitalization, therapy and fact witnesses], citing *Molien v Kaiser Found. Hosps.*, 27 Cal 3d 916, 929-931, 616 P2d 813, 821 [1980] and *Bowen v Lumbermens Mut. Cas. Co.*, 183 Wis 2d 627, 660-663, 517 NW2d 432, 446-447 [1994].)

By contrast, the objective and reasonable standard embraced by the majority as set out in *Ornstein* rejects this essential subjective component. The objective standard operates, instead, by attaching a label to the mental injury (in this case, the label, "fear of AIDS," or "AIDS phobia"), and then uses empirical evidence about the underlying physical component to impose an artificial uniformity of mental insult in order to foreclose mental injury claims and thereby limit recovery. The majority is now empowering a court to determine as a matter of law, the precise moment in time when a plaintiff's emotional distress is no longer compensable, and therefore, when it must cease.

To arrive at this point, the majority simply adhered to *Ornstein* in following the Second Department in *Brown*, a case where the plaintiff commenced an action for negligent infliction of emotional distress after she was punctured by a negligently discarded needle that had been used on an HIV-positive baby. The *Brown* court acknowledged that exposure to the disease is a "cause for anxiety" but held that in order to sustain an action to recover for emotional distress, the plaintiff had to show, inter alia, a "likelihood that infection will develop." (*Brown v New York City Health & Hosps. Corp.*, 225 AD2d at 42, 47.) The Second Department then looked to a purported medical

consensus* that: "95% of HIV carriers will test positive . . . for the virus within six months of exposure, and it is unlikely that an individual who tests HIV negative more than six months after . . . exposure will become infected with the virus as a result of that exposure." (225 AD2d at 43.) The *Brown* court thus concluded that "[a] plaintiff's initial, reasonable fear of contracting AIDS thus becomes unreasonable if more than six months have passed . . . and the plaintiff continues to test negative." (225 AD2d at 47.) Consequently, recovery of damages was limited to that suffered during this six-month "window of anxiety" period.

The illogic of the *Brown* decision and our slavish adherence to it is as startling as is its complete disregard of the common law. First, I am compelled to reiterate that if the HIV tests are accurate for 95% of those tested, the necessary corollary is that they are inaccurate for 5 out of every 100 individuals tested. In other words, 5% of those testing negative will actually become HIV positive. The question arises as to what authority, legal or medical, allows any court rather than a jury to determine as a matter of law, that a plaintiff's fear of belonging to that 5% group is not genuine, or even reasonable.

Second, if legal standards are to emanate from medical statistics, then a more interesting conclusion can be drawn from the majority's acceptance of *Brown*'s dictum that "the statistical probability of contracting HIV from a single needle stick, *assuming the needle was contaminated,* is approximately 0.3 to 0.5%." (225 AD2d at 47 [emphasis added].) According to those statistics, only between 3 to 5 out of 1,000 plaintiffs stuck by a contaminated needle are likely to contract AIDS. The odds of contracting AIDS from a contaminated needle therefore are nowhere near as great as the odds that an HIV test may be inaccurate when it shows a plaintiff to be HIV negative. Yet the former fear of being one of 3 in 1,000 (a .3% chance) is indulged by the law, whereas a plaintiff's fear that he/she is one of 5 in 100 (a 5% chance) to be HIV positive despite tests showing an absence of HIV antibodies is deemed unreasonable, as a matter of law.

The inconsistency simply serves to underscore the axiom that statistical results cannot speak to the actual mental state of the individuals being tested. Nor does the majority apply any legal

---

* At the time of the decision in 1996, courts in other jurisdictions used medical data that varied as to how long a time of negative testing was required before a plaintiff should feel assured he/she was not HIV positive. The window, in fact, appeared to range from six months to a year. (*Williamson v Waldman*, 150 NJ 232, 251, 696 A2d 14, 23 [1997].)

standard found either in the common law or statute in determining that a plaintiff is not entitled, as a matter of law, to compensable damages for psychological harm beyond a fixed period of six months. I submit once again that no such legal standard exists. The *Brown* court and those jurisdictions that limit recovery for emotional distress to six months have, in effect, judicially, and improperly, imposed a "statute" of limitations on these emotional distress claims.

The Supreme Court of the United States specifically rejected such limitation, observing that "[e]motional injuries may occur far removed in time and space from the negligent conduct that triggered them." (*Consolidated Rail Corporation v Gottshall*, 512 US 532, 545 [1994].) In *Gottshall*, the Court appeared as concerned as the majority about limiting liability and weeding out dishonest or spurious claims. But the Court further observed that, in effect, common-law limitations already exist and are "phras[ed]" in terms of proximate causation or in terms of duty owed to certain plaintiffs. (512 US at 546.)

In the case at bar, the plaintiff claims that the defendants had a duty to Ms. Sims to supervise her, thereby protecting her from harm caused by discarded, contaminated needles. As a result of their breach of duty, Ms. Sims suffered emotional harm. The jury found that the defendants' conduct was the proximate cause of such emotional injury. However, they attempt to limit the plaintiff's recovery by application of *Ornstein* and *Brown* to the jury's award of $100,000 for past post-traumatic stress disorder from six months after the date of the needle stick to the date of trial.

Traditional negligent infliction of emotional distress claims should not be limited by a judicially imposed reasonableness period that takes from the jury the determination of the extent of a plaintiff's damages. Or, as observed by one court: "the reaction of any claimant who receives a puncture wound from medical waste will be subjective. It will vary in character and intensity with the individual . . . Unavoidably jury questions are created, not issues to be decided as a matter of law: was plaintiff's reaction a reasonable response to the stimulus? for how long? to what extent?" (*Williamson v Waldman*, 291 NJ Super 600, 605-606, 677 A2d 1179, 1181-1182 [1996], *mod* 150 NJ 232, 696 A2d 14 [1997].)

In the case at bar, Ms. Sims claims that her emotional distress is not limited to fear of contracting AIDS but that she suffered permanent psychological harm in the form of post-traumatic stress disorder as a result of being punctured by a contaminated needle.

Given its departure from common-law principles of tort liability, the six-month rule should be discarded as meaningless. The "window of anxiety" approach is nothing more than a recently contrived "compromise between the harshness of precluding total recovery for the fear of AIDS and allowing a fearful plaintiff a windfall." (Mark McAnulty, Casenote, *Shattering the "Reasonable Window of Anxiety"—Recovering Emotional Distress Damages for the Fear of Contracting AIDS*, 19 S Ill U LJ 661, 682 [1995].)

The *Ornstein* court's anxiety over the potential for limitless abuse reflects this, but is nevertheless exaggerated, and not novel. New York tort law has long held that "[a]lthough fraud, extra litigation and a measure of speculation are, of course, possibilities, it is no reason for a court to eschew a measure of its jurisdiction. 'The argument from mere expediency cannot commend itself to a Court of justice, resulting in the denial of a logical legal right and remedy in *all* cases because in *some* a fictitious injury may be urged as a real one.' " (*Battalla v State of New York*, 10 NY2d at 240-241, quoting *Green v T.A. Shoemaker & Co.*, 111 Md 69, 81, 73 A 688, 692 [1909].)

For the foregoing reasons, I dissent.